**EXHIBIT 9**

```
 1    CV-03-048003S                    :    SUPERIOR COURT

 2    FAIR HAVEN DEVELOPMENT CORP.     :    J.D. OF NEW HAVEN

 3           VS.                       :    AT NEW HAVEN

 4    CITY OF NEW HAVEN                :    OCTOBER 7, 2005

 5

 6

 7

 8

 9

10

11

12    B E F O R E:

13              THE HONORABLE WILLIAM L. HADDEN, JR.,

14                                              Judge

15

16    A P P E A R A N C E S:

17

18

19         SUSAN WALLACE, ESQUIRE
           ATTORNEY FOR THE PLAINTIFFS
20

21         RODGER W. LEHR, ESQUIRE
           ATTORNEY FOR THE DEFENDANTS
22

                                VICTORINE KALISZEWSKI
23                              CERTIFIED COURT REPORTER

24

25

26

27
```

```
 1         H A R V E Y    E D E L S T E I N,
 2     having been previously duly sworn, was examined and
 3     testified as follows:
 4          THE COURT:  Mr. Edelstein, is your name
 5     Harvey Edelstein?
 6          THE WITNESS:  That's correct.
 7          THE COURT:  Sit right down there.
 8          You're still under oath.
 9          THE WITNESS:  Thank you.
10          THE COURT:  Go ahead.
11          MR. LEHR:  Show me the exhibit.
12          MS. WALLACE:  No objection?
13          MR. LEHR:  No.
14          MS. WALLACE:  Can I have this marked as a
15     full exhibit, your Honor.  Number 28 for the
16     plaintiff.
17          THE COURT:  Exhibit -- what are we up to?
18          THE CLERK:  Exhibit 28.
19          THE COURT:  Exhibit 28, full exhibit.
20               (Whereupon, Plaintiff's Exhibit
21                28, a document, was marked in
22                evidence.)
23     BY MS. WALLACE:
24     Q    Mr. Edelstein, good afternoon.  I think
25     it's afternoon now.
26     A    Good afternoon.
27     Q    What is this that's been marked, that is
```

1  having to do with the revitalization of the
2  neighborhood and specifically about the properties
3  that we were requesting and, most specifically, so
4  that we don't talk about everything we talked about
5  but just this building, most specifically about
6  applications that were submitted, actually, a
7  $250,000 grant that was submitted for home funds for
8  this building, which was verbally awarded by
9  Mr. Rizzo to us, which he had complete control,
10 which would have kicked off our fundraising
11 significantly.  Most specifically, about context I
12 was making with state representatives and state
13 Congressman with regard to bond funds from the State
14 of Connecticut, conversations I had began with the
15 Connecticut commission on the arts for grant funds
16 for the cultural activities in the building, all of
17 those things.  Mr. Rizzo was privy to the plans and
18 discussions that we had about the necessity for City
19 support, funding, and the complexability of this
20 development.
21     Q   Okay.  In fact, was it necessary -- what
22 effect did the City's failure to release the funds
23 to Fair Haven Development Corp. have on all of those
24 plans you were just talking about?
25     A   Devastating.
26     Q   In what way?
27     A   It is impossible to go to other funding

```
 1   source -- first of all, there were some potential
 2   matching funds that, I believe, is even recorded in
 3   the document that was just discussed a moment ago,
 4   the report on the activities on that building.  The
 5   facade committee of the City of New Haven, there's a
 6   matching grant of approximately $30,000.  Those
 7   funds, in fact, were, again, awarded.  I have an
 8   e-mail from the chairman of that committee awarding
 9   those funds, but, of course, you had to match them,
10   they were matching funds.  Those funds -- those
11   matching funds could not be acquired because we
12   couldn't match them; funds were just not there.
13            It should be noted that Mr. Rizzo was
14   completely supportive of everything we were doing up
15   until a specific day when his support changed to
16   opposition.
17        Q    And what was that day?
18        A    It was the day after a public hearing
19   about a particular piece of property where the
20   aldermanic representatives of the ward disagreed
21   with the mayor's proposed decision.
22        Q    Okay.  Who?
23        A    Immediately following that day, instead of
24   the support that the mayor and Mr. Rizzo had been
25   giving this corporation, it turned into outright --
26            MR. LEHR:  Objection at this point, it's
27        unresponsive.
```

1    MS. WALLACE: He's interrupting his
2  answer, your Honor.
3    MR. LEHR: I don't know what he's doing.
4    THE COURT: I'm not sure what the counsel
5  is --
6    MS. WALLACE: Counsel has interrupted.
7  You've asked me not to ask him leading
8  questions, to ask him open questions. I've
9  asked him open questions, he's answering.
10    THE COURT: I'm trying to get to what your
11  question is. He started off with this answer
12  by saying Rizzo was completely supportive of
13  what we were doing until there was an
14  aldermanic meeting and something happened at
15  the meeting, I'm not sure what.
16  BY MS. WALLACE:
17    Q  The aldermanic meeting, approximately what
18  date was that?
19    A  Oh, God --
20    MR. LEHR: Your Honor, I'm beginning to
21  wonder what this is in regard to.
22    THE COURT: Counsel, I'm afraid we have
23  gone long past technical rebuttal evidence.
24    MS. WALLACE: Your Honor, it's directly in
25  rebuttal to Mr. Rizzo's testimony that this
26  decision was not made in a partisan way, that
27  the decision was made based on a number of --

1   Mr. Rizzo claimed that he had evidence of
2   wrongdoing by this organization and that he,
3   therefore, could not release the funds while he
4   investigated evidence of wrongdoing.
5       THE COURT: Okay. Fine. Get back to the
6   aldermanic meeting and something happened and
7   I'm not sure what.
8       MS. WALLACE: I'm trying to get to it,
9   your Honor.
10      THE COURT: It sounds like there's some
11  people on different sides of something. I have
12  no knowledge of it. I don't know anything
13  about it. I don't know who the alderman
14  personalities are.
15      MS. WALLACE: We're trying to get to it,
16  your Honor.
17      THE COURT: We have an aldermanic meeting
18  and something happened, what?
19      THE WITNESS: I think it's important that
20  everybody understand in this case --
21      THE COURT: First of all, approximately
22  when are you talking about?
23      THE WITNESS: Shortly before the letter
24  stopping the funds, shortly before the letter
25  retracting the property, shortly before all of
26  those aggressive negative actions against Fair
27  Haven Development Corporation occurred, there

1          was a public hearing, a board of alderman
2          public hearing.
3     BY MS. WALLACE:
4          Q    Was it in May of 2002?
5          A    I believe so.  If you tell me it is.
6          Q    Was it immediately pre-dating Miss
7     Krugman's letter?
8          A    Yes.
9          Q    So, who were the aldermen involved in
10    this?
11         A    It was a committee, an aldermanic
12    committee of the board of alderman having a public
13    hearing with regard to the disposition of a piece of
14    property on Ferry Street in the Fair Haven
15    neighborhood.  The aldermanic committee was to
16    decide whether an agency, in this case, the Mutual
17    Housing Association of South Central Connecticut,
18    another agency, would receive this piece of property
19    for a multi-family development on three former --
20    anyway, the bottom line is that Fair Haven
21    Development Corporation felt that it should be
22    homeownership and not rental housing.  Fair Haven
23    Development brought a lot of people, 100 people to
24    the public hearing, the opposition brought 100
25    people to the public hearing, and there was a public
26    hearing in which the mayor's proposal was to give
27    the property to Fair Haven -- I mean, to mutual

```
 1   housing and the proposal on the part of the alderman
 2   who is in the ward, whose ward we're talking about,
 3   and the adjacent ward, were in opposition to the
 4   mayor's proposed use for that piece of property.
 5       Q    Who were those alderman?
 6       A    Raoule Avila and Kevin Diaz, both
 7   ex-official members of the board of Fair Haven
 8   Development Corporation.
 9       Q    And they were arguing for the properties
10   being renovated and sold as ownership?
11       A    Developed as three two-family houses.
12       Q    Now, who was the opposing alderman who
13   wanted these properties done as rental property?
14       A    Robin Krugman was one of the proposing,
15   but every single member of the committee that
16   supports the mayor were also in opposition to Fair
17   Haven Development's proposal in support of the
18   mayor's proposal.
19            MR. LEHR:  I'm going to object.
20            MS. WALLACE:  What --
21            MR. LEHR:  Please, I have an objection.
22            MS. WALLACE:  What objection?  There's no
23        question.  He's done testifying.
24            MR. LEHR:  No, I have an objection to his
25        previous answer.  He's testifying about board
26        of aldermen being on one side or the other with
27        no foundation laid out for the basis of,
```

1    apparently, what some opinion of his --

2        THE WITNESS: Vote. There was a vote.

3        MR. LEHR: He didn't testify about

4    anything.

5        THE COURT: Just a minute, Mr. Edelstein.

6        See, he includes things like the mayor's

7    committee. I don't know. Does the mayor have

8    a committee on the board of aldermen?

9        THE WITNESS: I never said that.

10       MS. WALLACE: I'll clarify.

11       THE COURT: I don't know what these things

12   mean.

13       MS. WALLACE: He said the mayor was in

14   favor of a certain proposal. A good number of

15   the members of the committee were aligned with

16   the mayor, some were not, much of the some who

17   were not were my clients.

18       THE COURT: Counsel, counsel, I would very

19   much like if we could somehow get a description

20   of the dispute before the board of aldermen.

21   Apparently, the mayor and some of the aldermen

22   were in favor of some property on Ferry Street,

23   did you say? To be given to another agency,

24   another nonprofit group.

25       THE WITNESS: That's correct.

26       THE COURT: And a bunch of the other

27   aldermen were in favor of this property being

1       given to Fair Haven Development Corporation.
2               THE WITNESS: That's correct.
3               THE COURT: And there was a vote.
4               THE WITNESS: That's correct.
5               THE COURT: I gather Alderman Krugman was
6       in favor of giving the property to the other
7       organization.
8               THE WITNESS: That's correct.
9               THE COURT: What was the name of it?
10              THE WITNESS: The other organization is
11      the Community Housing Organization of South
12      Central Connecticut, I think.
13              THE COURT: And which one prevailed?
14              THE WITNESS: The mayor's. In fact --
15              THE COURT: Which vote prevailed?
16              THE WITNESS: Mutual housing was awarded
17      the property by the committee.
18              THE COURT: Okay. And I gather from what
19      you testified, that there were a lot of
20      spectators came to the aldermanic meeting?
21              THE WITNESS: Several.
22              THE COURT: Of which it was hotly
23      contested?
24              THE WITNESS: Exactly.
25              THE COURT: Okay. Now, do we have to get
26      into the details of that any further?
27              MS. WALLACE: No, your Honor. Very

1       briefly. Just very briefly.
2            THE COURT: Fine.
3  BY MS. WALLACE:
4       Q   And then what followed next was the letter
5  from Miss Krugman asking Andrew Rizzo to investigate
6  Fair Haven Development Corp., is that correct?
7       A   That's correct.
8       Q   Now, Mr. Rizzo's investigation also went
9  into other matters besides this issue of the
10 property being sold to a board member's daughter.
11 He also went into matters involving the alleged
12 payment by FLECHES of bills of FHDC or sharing of
13 the two organizations of -- it was telephone bills,
14 copying and sharing of personnel?
15           MR. LEHR: Objection, it misstates the
16       evidence. The allegation was that Fair Haven
17       Development Corporation was paying bills of
18       FLECHES, not the converse, which is what she
19       just said.
20           THE COURT: Is that the way it went?
21           THE WITNESS: Yes.
22           MS. WALLACE: Yes, your Honor.
23           MR. LEHR: You're welcome.
24           THE COURT: Why don't you restate the
25       question.
26 BY MS. WALLACE:
27      Q   Mr. Edelstein, understanding that Andrew

```
 1   Rizzo's investigation included inquiry into
 2   purported payments by -- purported payments by FHDC
 3   of certain bills that were rightfully FLECHES'
 4   bills, including some telephone calls to Puerto
 5   Rico, some copying, and some sharing of personnel,
 6   okay, as to the telephone bills, what, in fact, went
 7   on there?
 8        A    I feel morally compelled to tell you that
 9   this is an alleged investigation; it was a sham.
10        Q    Okay.
11        A    It wasn't an investigation.
12        Q    But, please, answer the question?
13             MR. LEHR:  Excuse me.  Objection.
14             MS. WALLACE:  I'm going -- I'm directing
15   him to answer the question.
16             THE COURT:  The response of the witness is
17   nonresponsive.  It is stricken.
18             THE WITNESS:  Good.
19             THE COURT:  You were asked about the
20   telephone calls.
21             THE WITNESS:  Right.
22             What was the question with regard to the
23   telephone?
24   BY MS. WALLACE:
25        Q    With regard to the telephone calls, what
26   actually occurred there?
27        A    Apparently, some phone calls were made
```